T.C. Memo. 1999-357


UNITED STATES TAX COURT


ESTATE OF ONA E. HENDRICKSON, DECEASED,
DONALD G. HENDRICKSON, PERSONAL REPRESENTATIVE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 13527-97.                    Filed October 25, 1999.


<u>Scott R. Cox</u> and <u>Sheldon G. Gilman</u>, for petitioner.

<u>Russell D. Pinkerton</u>, for respondent.


CONTENTS

Overview of Issues and Conclusions . . . . . . . . . . . . . . . . 4

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . 6

    The Hendrickson Family Farm . . . . . . . . . . . . . . . . 9
    Decedent's Gifts of Family Farm Land . . . . . . . . . . . 9
    Income and Losses From Family Farm Operations . . . . . 11
    Decedent's Share of Investment Income of Garry's Estate;
        Value of Coal Mining Rights . . . . . . . . . . . . . 14

Distributions From Garry's Estate to Decedent  . . . . .  16
Expenses Attributable to Decedent's Investment Income  .  17
Net Investment Income of Garry's Estate to Which Decedent
    Became Entitled During 1979-93  . . . . . . . . . . .  17
Facts Relating to Petitioner's Primary Position--Existence
    of Claimed Family Farm Partnership  . . . . . . . . .  18
Facts Relating to Petitioner's Secondary Position--
    Use of Decedent's Investment Income To Pay Expenses
    of Family Farm; Consideration Received by Decedent for
    Any Investment Income Not So Used  . . . . . . . . . .  21
HEI Receivable . . . . . . . . . . . . . . . . . . . . .  21
Children's Performance of Services for Family Farm . . .  22
Land Bank Loan . . . . . . . . . . . . . . . . . . . . .  23
Use of Land Bank Loan Proceeds . . . . . . . . . . . . .  23
Interest Deductions Claimed by Garry's Estate or Decedent
    With Respect to Land Bank Loan  . . . . . . . . . . .  25
Security for Land Bank Loan Included in Decedent's Estate  25
Miscellaneous Facts Relating to Land Bank Loan . . . . .  27

OPINION

I.  Did Decedent Make Taxable Gifts of Investment Income
       Received by Garry's Estate During 1979-93?  . . . . . .  27
    A.  Relevance of Decedent's Taxable Gifts to This
           Estate Tax Case . . . . . . . . . . . . . . . . . .  29
    B.  Broad Definition of "Taxable Gift"  . . . . . . . . .  31
    C.  The Parties' Positions--In General  . . . . . . . . .  33
    D.  Petitioner's Primary Argument--Decedent's Transfer
           of Investment Income Was a Bona Fide, Ordinary
           Business Transaction  . . . . . . . . . . . . . . .  39
    E.  Petitioner's Secondary Argument--Decedent Either
           Spent Investment Income on Her Own Expenses
           or Received Full Consideration for Any Income
           That Benefited Children . . . . . . . . . . . . . .  48
        1.  Petitioner's Estate "Accounting"  . . . . . . . .  49
        2.  Unreliability of Petitioner's Accounting  . . . .  50
        3.  Petitioner's Accounting Shows That Much of
               Decedent's Investment Income Was Spent on
               Children's Expenses . . . . . . . . . . . . . .  52
        4.  Decedent Did Not Receive Consideration
               Claimed by Petitioner for Any Income Not
               Used To Pay Farm Expenses . . . . . . . . . . .  53
        5.  No Land Bank Loan Payments Were Decedent's
               Expenses  . . . . . . . . . . . . . . . . . . .  56
        6.  Decedent's Income Was Not Used To Pay Decedent's
               Share of Expenses of Any Business Other Than
               Family Farm . . . . . . . . . . . . . . . . . .  58

F.  Decedent Gave Her Investment Income to Children
As Asserted by Respondent on Brief, Except to
Limited Extent Income Was Used To Pay Decedent's
Share of Expenses of Family Farm . . . . . . . . .  60

II.  Is Petitioner Entitled To Deduct a Portion of
Land Bank Loan as Unpaid Mortgage? . . . . . . . . . .  64
A.  Value of Security Included in Decedent's Estate  . .  65
B.  Uncertainty That Land Bank Loan Will Ever Be
Paid by Decedent's Estate  . . . . . . . . . . . .  68
1.  Petitioner's Section 2053 Deduction Must
Be Reduced on Account of Decedent's
Contribution Rights . . . . . . . . . . . . .  68
2.  The Value of Decedent's Contribution Rights
Cannot Be Determined  . . . . . . . . . . . .  70
3.  Decedent's Status as Guarantor or
"Accommodation" Party . . . . . . . . . . . .  71
C.  Conclusion Re Unpaid Mortgage Deduction  . . . . . .  72

III.  Unused Exclusions Available as Conceded in
Respondent's Brief; Offset and Deduction for Gift
Taxes Payable  . . . . . . . . . . . . . . . . . . . .  74

MEMORANDUM FINDINGS OF FACT AND OPINION

BEGHE, Judge:  Respondent determined a deficiency of $1,243,548 in the Federal estate tax of the Estate of Ona E. Hendrickson, Donald G. Hendrickson, personal representative (petitioner).  Respondent also determined a late filing addition to tax of $248,710 under section 6651(a)(1).[1]

---

[1] All section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise specified.

By amended answer, respondent asserted an additional deficiency of $150,178 in estate tax and an additional late filing addition of $30,035.

### Overview of Issues and Conclusions

Following concessions by the parties,[2] the two issues for decision are the "lifetime gifts" issue and the "unpaid mortgage" issue.

The lifetime gifts issue concerns whether, during 1979-93, Ona E. Hendrickson (decedent) made lifetime taxable gifts to her children of $913,200 in coal royalties, dividends, and interest received by the estate of her late husband. Petitioner asserts that decedent made no such gifts. According to petitioner, decedent made transfers of her share of the estate's investment income to a "family farm partnership" owned one-half by decedent and one-half by the children. Petitioner argues that these transfers were part of a bona fide, ongoing, ordinary business transaction and therefore were not gifts, regardless of the shortfall in the pecuniary consideration decedent received for

---

[2] Because petitioner still contests much of the asserted deficiency in estate tax, petitioner does not concede the amount of the late filing addition determined by respondent. Petitioner does concede, however, that the addition applies to any deficiency we redetermine.

Respondent has conceded the allowance of the properly substantiated expenses of this litigation as additional administrative expenses of decedent's estate.

them.  See sec. 25.2512-8, Gift Tax Regs.  Petitioner alternatively argues that even if no bona fide farm partnership existed, decedent still made no gifts of the investment income because most or all of the income was spent on decedent's share of the family farm's expenses.  Petitioner further asserts that decedent received full consideration for any income not so spent by reason of the children's performance of services for the family farm and the receipt of an indebtedness from Hendricksons Enterprise, Inc., a corporation whose shares were owned by the children and decedent.

Any taxable gifts we find decedent made during 1979-93 must be taken into account in computing petitioner's estate tax under section 2001(b).  In addition, respondent, in a separate notice, also determined deficiencies in decedent's Federal gift taxes for 1980-92 on the basis of the same gifts determined in the estate tax notice at issue herein.  No petition was filed with this Court concerning the gift tax notice.  As of the time of trial, respondent had assessed the gift tax deficiencies but had taken no action to collect them.  Respondent's counsel has informed the Court that respondent will follow the Court's conclusions in this case as to the amount of decedent's lifetime taxable gifts, in any future collection actions with respect to the gift tax assessments.  As a result, any gifts we find decedent made during

1979-93 will also determine petitioner's gift tax liability in the related controversy.

We conclude that decedent gave $913,200 in investment income to the children as argued by respondent on brief, except to the limited extent we find the income was used to pay decedent's share of family farm expenses.

The unpaid mortgage issue concerns whether petitioner may deduct, as an unpaid mortgage under section 2053(a)(4), part of the outstanding balance (at decedent's death) of a secured bank loan. The resolution of this issue requires us to consider the amount of the security for the loan that was included in decedent's estate.

We conclude that petitioner is not entitled to a deduction for the loan.[3]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found; the stipulation of facts and the related exhibits are incorporated by this reference.

---

[3] In the statutory notice, respondent denied any deduction for the bank loan and also asserted that decedent gave the loan proceeds to her children. Respondent has since conceded that these are alternative positions. Our conclusion that petitioner may not deduct the outstanding loan balance therefore renders moot respondent's contention that the proceeds of the loan were a gift.

At the time of her death, decedent resided in Warrick County, Indiana. At the time of filing of the petition in this case, the address of decedent's personal representative, Donald G. Hendrickson, was in Boonville, Indiana, the county seat of Warrick County. Donald Hendrickson also serves as the judge of the Warrick County Circuit Court.

Decedent married Garry O. Hendrickson (Garry) in 1924. After more than 50 years of marriage, Garry died on July 6, 1979. Decedent died 14 years later, on June 4, 1993.

At the time of Garry's death, decedent and Garry had three children: Donald Hendrickson, Vera Lou Klippel (Mrs. Klippel), and James O. Hendrickson (collectively, the children).

The value of Garry's gross estate for Federal estate tax purposes exceeded $4 million. The value of Garry's taxable estate was much less. Garry's will provided for a bequest to decedent of property having a value equal to the maximum marital deduction allowable for Federal estate tax purposes.[4] When Garry died, the maximum marital deduction was equal to 50 percent of the adjusted gross estate (subject to certain additional adjustments). See sec. 2056(c), as in effect for decedents dying before 1982. The value of Garry's bequest to decedent, and the

---

[4] The will also provided that this bequest was to include its proportionate share of the income of Garry's estate from and after the date of Garry's death.

marital deduction ultimately allowed to Garry's estate, was $2,154,781.

As filed with respondent, petitioner's estate tax return reported a gross estate of $1,107,141, a taxable estate of $272,756, and adjusted taxable gifts of $313.

Garry's will left the residue of his estate to the children. His will specifically provided that all Garry's debts and expenses of estate administration and all inheritance and other transfer taxes were to be paid from the residuary estate, without apportionment.

Garry's estate ultimately paid respondent and the State of Indiana a total of over $1 million on account of estate and inheritance taxes. The parties agree that pursuant to Garry's will these taxes (and all administration expenses) were the obligation of the children, to be paid out of their shares of the estate.

During the 14-year period between Garry's death and decedent's death (i.e., from 1979 to 1993) Garry's estate was neither wound up nor terminated. Instead, it was administered as an unsupervised estate; decedent was the personal representative. Garry's estate therefore continued to hold substantial assets and to receive substantial amounts of income during this period.

The Hendrickson Family Farm

When Garry died in 1979, he owned 1,804 acres of land in Warrick County (sometimes referred to hereinafter as the family farm). The parties agree that pursuant to Garry's will decedent became entitled to an undivided 50-percent interest in this land and in the income generated by the land after Garry's death.

Decedent's Gifts of Family Farm Land

Shortly after Garry died, decedent started giving her 50-percent interest in the family farm land to the children and their spouses. From 1980 (the year following Garry's death) to decedent's death in 1993, decedent gave away part of her interest in the family farm land in almost every year, as shown in the following table:

| Year | Number of acres in which decedent owned an undivided 50-percent interest at beginning of year | Decedent's ownership interest, expressed as a percentage of total acres in the family farm | Number of acres given during the year |
|---|---|---|---|
| 1979 | 1,804 | 50.00 | -0- |
| 1980 | 1,804 | 50.00 | 45 |
| 1981 | 1,759 | 48.75 | 54 |
| 1982 | 1,705 | 47.26 | 79 |
| 1983 | 1,626 | 45.07 | -0- |
| 1984 | 1,626 | 45.07 | 152 |
| 1985 | 1,474 | 40.85 | 200 |
| 1986 | 1,274 | 35.31 | 297 |
| 1987 | 977 | 27.08 | 222 |
| 1988 | 755 | 20.93 | 120 |
| 1989 | 635 | 17.61 | 120 |
| 1990 | 515 | 14.27 | 161 |
| 1991 | 354 | 9.81 | 185 |
| 1992 | 169 | 4.68 | -0- |
| 1993 | 169 | 4.68 | -0- |

Decedent filed Federal gift tax returns reporting her gifts of family farm land.  Respondent has neither challenged the valuations of the land reported on those returns nor asserted that decedent made any gifts of land during the few gift tax periods for which returns were not filed.

On the basis of the gift tax returns filed by decedent, the value of the family farm land given by decedent during 1979-93 was the following:

| Year | Value of land given | Number of donees (three children plus spouses) | Value of gift per donee | Applicable annual exclusion per individual | Unused exclusion for gifts to the three children |
|------|------|------|------|------|------|
| 1979 | -0- | none | -0- | $3,000 | $9,000 |
| 1980 | $15,000 | 6 | $2,500 | 3,000 | 1,500 |
| 1981 | 20,000 | 6 | 3,333 | 3,000 | -0- |
| 1982 | 30,500 | 6 | 5,083 | 10,000 | 14,750 |
| 1983 | -0- | none | -0- | 10,000 | 30,000 |
| 1984 | 55,264 | 6 | 9,211 | 10,000 | 2,368 |
| 1985 | 53,828 | 6 | 8,971 | 10,000 | 3,086 |
| 1986 | 60,313 | 6 | 10,052 | 10,000 | -0- |
| 1987 | 58,879 | 6 | 9,813 | 10,000 | 561 |
| 1988 | 59,980 | 6 | 9,997 | 10,000 | 10 |
| 1989 | 58,980 | 6 | 9,830 | 10,000 | 510 |
| 1990 | 59,622 | 6 | 9,937 | 10,000 | 189 |
| 1991 | 59,983 | 6 | 9,997 | 10,000 | 9 |
| 1992 | -0- | none | -0- | 10,000 | 30,000 |
| 1993 | -0- | none | -0- | 10,000 | 30,000 |
| Total | 532,349 | | | | 121,983 |

In the foregoing table, the dollar amount shown in the last column for any year is the amount of annual gift tax exclusion

available for decedent's gifts to her three children during that year that was not used to offset the land gifts.

Income and Losses From Family Farm Operations

Although decedent gave almost all her interest in the family farm land to her children (and their spouses) during the period 1979-93, the taxable income and loss resulting from the operations (or, in some years, the rental) of the family farm during that period were reported on the Federal fiduciary income tax returns filed by Garry's estate.[5]  These returns reported the following amounts of net income (or loss) from the family farm:

| Fiscal year ending 2/28 or 2/29 | Net family farm income (or loss) |
|---|---|
| 1980 | ($35,702) |
| 1981 | (166,606) |
| 1982 | (177,264) |
| 1983 | 49,324 |
| 1984 | 5,157 |
| 1985 | 1,833 |
| 1986 | (3,612) |
| 1987 | (27,906) |
| 1988 | (23,796) |
| 1989 | (22,166) |
| 1990 | (28,204) |
| 1991 | (17,402) |
| 1992 | (9,425) |
| 1993 | (12,807) |
| 1994 | (13,001) |
| Total | (481,577) |

---

[5] For the fiscal years ending in 1985 and 1986, almost all family farm income reported by Garry's estate was rental income. For the fiscal years ending in 1987-93, the estate reported its farm income simply as "other income", but it also reported that the principal activity of the family farm was "land rental".  For the fiscal year ending in 1994, the estate reported its farm income on Form 4835, Farm Rental Income and Expenses.

The information set forth on the income tax returns filed by Garry's estate for its fiscal years ended in February 1980 through February 1994 establishes the maximum net amount of funds spent by the family farm during 1979-93 that was not generated by the farm itself. This amount is referred to as the "net cash needs" of the family farm during 1979-93.

The family farm used the cash method of accounting. Therefore, the family farm generated funds during 1979-93 in amounts corresponding to the items of farm income reported on the income tax returns of Garry's estate.

Neither petitioner nor respondent has claimed that the family farm information reported on the tax returns of Garry's estate is inaccurate. In addition, petitioner has not identified any unreported deductible expenditures of funds by the family farm during 1979-93. As a result, all deductible expenditures of the family farm during 1979-93 are included in the net tax loss of $481,577 reported on the income tax returns of Garry's estate.

With respect to the nondeductible expenditures of the family farm during 1979-93, the family farm did purchase some farm equipment (and other depreciable property) after Garry's death. However, the farm stopped purchasing equipment in the early 1980's. As a result, the cost of the depreciable property acquired by the family farm after Garry's death (and not subsequently sold by the farm) was recovered by the farm via the

depreciation deductions included in the farm's $481,577 reported net tax loss.

Petitioner has not identified any nondeductible expenditures made by the family farm during 1979-93, other than the purchases of depreciable property referred to above.[6] In addition, petitioner asserts that at the time of decedent's death, the value of the family farm did not exceed the value of the farm land itself. Moreover, during the fiscal years ending from February 1985 through February 1994, the family farm's principal activity was the rental of the family farm land; depreciation and taxes accounted for almost all of the farm's expenses during this period.

The cost of all family farm expenditures made during 1979-93 is therefore accounted for in the $481,577 reported tax loss of the family farm.

Approximately $171,500 of the $481,577 reported net loss resulted from deductions claimed for the depreciation of farm equipment (and other farm property) owned by Garry at the time of his death. Because this property was not purchased by the family farm, the farm did not make any cash expenditures during 1979-93 corresponding to the depreciation deductions claimed.

---

[6] The farm did purchase a few cows and hogs after Garry's death, but it sold all its livestock in its fiscal year ended in February 1984.

Similarly, at the time of his death Garry also owned certain growing crops and livestock worth $70,893, which were assets of the family farm. Garry's estate sold these crops and livestock during 1979-93, and it used all $70,893 of basis in calculating the family farm income reported on its fiduciary income tax returns. Because the family farm did not purchase these assets, the family farm received $70,893 more cash during 1979-93 than the amount of income reported on the sale of the assets.

The aggregate net cash needs of the family farm during 1979-93 therefore did not exceed the $481,577 loss reported on the income tax returns of Garry's estate, less the $171,500 of depreciation and $70,893 of basis claimed with respect to property owned by Garry at the time of his death. Accordingly, the family farm's aggregate net cash needs for 1979-93 did not exceed $239,184.

Decedent's Share of Investment Income of Garry's Estate; Value of Coal Mining Rights

In addition to the family farm, at the time of his death Garry owned: (1) A one-half interest in certain coal mining rights to 5,499 acres in Gibson County, Indiana; (2) a stock portfolio; (3) a $359,534 receivable from Hendricksons Enterprise, Inc. (HEI);[7] and (4) certain other interest-

[7] Hendricksons Enterprise, Inc., is an automobile and farm implement dealership, most of the stock of which was owned by decedent and the children on the date of decedent's death.

generating investments.  The parties agree that pursuant to Garry's will decedent became entitled to 50 percent of these assets and 50 percent of the income generated therefrom.

During 1979-93, Garry's estate received substantial payments of coal royalties from the Gibson County coal mining rights.  It also received large amounts of dividends and interest.  The stipulated amounts of coal royalties, dividends, and interest (referred to hereinafter as the investment income) received by Garry's estate during 1979-93 were as shown in the second, third, and fourth columns of the following table:

| Year | Coal royalties | Interest | Dividends | Total investment income | Decedent's 50-percent share |
|------|------|------|------|------|------|
| 1979 | $22,736 | $21,409 | $2,725 | $46,870 | $23,435 |
| 1980 | 30,261 | 3,095 | 7,836 | 41,192 | 20,596 |
| 1981 | 30,261 | 78 | 4,959 | 35,298 | 17,649 |
| 1982 | 37,105 | 43,498 | 4,853 | 85,456 | 42,728 |
| 1983 | 30,883 | 47,488 | 5,345 | 83,716 | 41,858 |
| 1984 | 414,448 | 43,521 | 6,992 | 464,961 | 232,481 |
| 1985 | 160,561 | 54,545 | 7,232 | 222,338 | 111,169 |
| 1986 | 234,664 | 52,362 | 7,536 | 294,562 | 147,281 |
| 1987 | 209,573 | 40,052 | 7,644 | 257,269 | 128,634 |
| 1988 | 30,883 | 63,315 | 8,371 | 102,569 | 51,285 |
| 1989 | 30,883 | 33,590 | 9,185 | 73,658 | 36,829 |
| 1990 | -0- | 33,344 | 9,458 | 42,802 | 21,401 |
| 1991 | -0- | 25,453 | 9,072 | 34,525 | 17,262 |
| 1992 | 85,176 | 24,479 | 8,998 | 118,653 | 59,327 |
| 1993 | 86,063 | 1,067 | 8,539 | 95,669 | 47,834 |
| Total | 1,403,497 | 487,296 | 108,745 | 1,999,538 | 999,769 |

By reason of having become entitled under Garry's will to 50 percent of the coal royalties, dividends, and interest, decedent became entitled to $999,769 of the investment income of Garry's estate during 1979-93, as shown in the foregoing table.

At the time of Garry's death, the value of the Gibson County coal mining rights was approximately $1.5 million; the value of decedent's 50-percent interest in those rights was approximately $750,000. By the time of decedent's death, the value of decedent's interest had declined to $268,805.

Distributions From Garry's Estate to Decedent

Notwithstanding the approximately $2 million in investment income Garry's estate received--and the $1.8 million excess of that income over the aggregate net cash needs of the family farm--Garry's estate made few distributions to decedent during 1979-93. The Federal fiduciary income tax returns of Garry's estate do not claim any distribution deductions for any of the fiscal years ending from February 1980 through February 1994. However, respondent has conceded that $14,303 in coal royalties was distributed to decedent as follows: $3,803 in 1979; $7,500 in 1980; and $3,000 in 1989. These were the only distributions by Garry's estate to decedent during 1979-93.

Expenses Attributable to Decedent's Investment Income

Respondent has conceded that Garry's estate paid the following amounts of expenses attributable to the production of the investment income during 1979-93:

| Year | Expenses attributable to investment income | Decedent's 50-percent share of the expenses |
|------|------|------|
| 1979 | -0- | -0- |
| 1980 | $207 | $104 |
| 1981 | 3,534 | 1,767 |
| 1982 | 743 | 371 |
| 1983 | 4,968 | 2,484 |
| 1984 | 10,318 | 5,159 |
| 1985 | 315 | 158 |
| 1986 | 61,534 | 30,767 |
| 1987 | 5,223 | 2,611 |
| 1988 | 13,132 | 6,566 |
| 1989 | 12,923 | 6,462 |
| 1990 | 5,391 | 2,695 |
| 1991 | 6,862 | 3,431 |
| 1992 | 7,816 | 3,908 |
| 1993 | 11,566 | 5,783 |
| Total | 144,532 | 72,266 |

During 1979-93, Garry's estate paid expenses attributable to decedent's share of its investment income in the amounts conceded by respondent, aggregating $72,266.

Net Investment Income of Garry's Estate to Which Decedent Became Entitled During 1979-93

During 1979-93, decedent became entitled to $913,200 of the investment income of Garry's estate, which was neither paid by the estate to defray expenses related to the production of that income nor distributed to decedent by the estate (this $913,200

is sometimes referred to hereinafter as decedent's net investment income).  The calculation is as follows:

| | | |
|---|---|---|
| Coal royalties, dividends, interest received by Garry's estate (1979-93) | | $1,999,538 |
| 50 percent of above investment income, to which decedent was entitled | | 999,769 |
| Less: Expenses allocable to decedent's share of investment income | $72,266 | |
| Investment income distributed to decedent | 14,303 | 86,569 |
| Net undistributed investment income of Garry's estate to which decedent was entitled | | 913,200 |

Facts Relating to Petitioner's Primary Position--Existence of Claimed Family Farm Partnership

There was no written partnership agreement between decedent and the children concerning the operation of the family farm.

Petitioner's Federal estate tax return did not report, as an asset of decedent's estate, a partnership interest in the family farm or a partnership interest of any kind.

Petitioner's estate tax return reported less than $15,000 worth of farm equipment as assets of decedent's estate.  All this equipment was inherited from Garry in 1979; none of it was acquired after that date.

None of decedent's individual income tax returns for 1989-93 (the only income tax returns of decedent in the record) reported any income or loss from a partnership.

The record contains no Forms 1065 (or other partnership tax reporting forms) relating to the claimed family farm partnership; at least three other pass-through entities in which decedent or the children have an ownership interest--HEI (a subchapter S corporation), Hendrickson Farms (a partnership), and G.O. Farms, Inc. (an S corporation)--file Federal income tax forms.

Petitioner's purported "accounting" of Garry's estate lists deposits made to and payments made from (other than interaccount transfers) the following three bank accounts, which petitioner claims were used to conduct the business of the family farm:  Old National Bank account No. 317015885 (the Garry estate account); Old National Bank account No. 317013807 (the Vera Lou Klippel agent account); and Old National Bank account No. 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 (the Hendrickson Farms account).  No part of any of these three accounts was reported as an asset of decedent's estate on petitioner's Federal estate tax return.

In 1979 (the year of Garry's death), part of the family farm was farmed by Garry personally, and part was farmed by tenant farmers.  Part of the family farm land was still being farmed by tenant farmers during 1985.

For its fiscal years ending in February 1980 through February 1986, Garry's estate reported the following amounts of gross farm rental income on its Federal fiduciary income tax returns:

| Fiscal year ending 2/28 or 2/29 | Gross farm rental income |
|---|---|
| 1980 | $54,386 |
| 1981 | 65,176 |
| 1982 | 47,367 |
| 1983 | 43,599 |
| 1984 | 8,900 |
| 1985 | 45,370 |
| 1986 | 32,000 |
| Yearly average | 42,400 |

At some time after Garry's death, the tenant farmers gave up their contracts to farm, and in 1984 or 1985 Donald Hendrickson began farming the formerly rented family farm land.  By 1992, Donald Hendrickson was farming almost all the land constituting the family farm.

On its income tax returns for its fiscal years ending from February 1987 through February 1994, Garry's estate reported the following amounts of gross income for the entire family farm:

| Fiscal year ending 2/28 or 2/29 | Gross income of family farm |
|---|---|
| 1987 | $16,094 |
| 1988 | 9,901 |
| 1989 | 8,536 |
| 1990 | 1,120 |
| 1991 | 5,391 |
| 1992 | 5,925 |
| 1993 | 2,203 |
| 1994 | 1,078 |
| Yearly average | 6,281 |

Facts Relating to Petitioner's Secondary Position--Use of Decedent's Investment Income To Pay Expenses of Family Farm; Consideration Received by Decedent for Any Investment Income Not So Used

During 1979-93, decedent became entitled to $913,200 of net investment income.

The net cash needs of the family farm during 1979-93 did not exceed $239,184.

As shown by petitioner's own "accounting" of Garry's estate, at least $443,000 of decedent's funds was not used to pay decedent's expenses.

Most of decedent's $913,200 in net investment income was not used to pay family farm expenses; the amount of decedent's income so used did not exceed $239,184.

HEI Receivable

There are no notes or other written agreements evidencing any loans from Garry's estate or decedent to HEI.

The Federal estate tax return of Garry's estate reported, as one of the assets of Garry's estate, a receivable from HEI in the amount of $359,534. The Federal estate tax return of decedent's estate also reported a receivable from HEI in the amount of $166,500.

On its Federal fiduciary income tax returns for the fiscal years ending February 1980 through February 1994, Garry's estate reported approximately $467,000 of interest income from HEI.

According to the "accounting" of Garry's estate introduced by petitioner at trial, the payments Garry's estate received from HEI during 1979-93 totaled approximately $411,000. Many of these payments were referred to as interest in the accounting.

The payments Garry's estate received from HEI during 1979-93 were therefore less than the amount of interest owed by HEI during that period.

HEI did not pay off the $359,534 receivable reported on the estate tax return of Garry's estate.

The $166,500 HEI receivable reported on petitioner's estate tax return is part of the same receivable reported on Garry's estate tax return.

Garry's estate did not use any of decedent's investment income to acquire the $166,500 receivable from HEI (or to acquire any other receivable from HEI during 1979-93).

Children's Performance of Services for Family Farm

During 1979-93, Donald Hendrickson and Mrs. Klippel each performed not more than 10 hours per week of services relating to the family farm, with values of $15 per hour and $8 per hour, respectively. James O. Hendrickson did not perform any material services relating to the family farm during that period.

The aggregate value of the services performed by the children relating to the family farm during 1979-93 therefore did not exceed $172,500 (i.e., 10 hours per week, times 50 weeks per

year, times 15 years, times the hourly rates of $15 and $8 per hour). During this period, the children owned from 50 percent to 95.32 percent of the land constituting the family farm. In addition, decedent was, of course, the children's mother.

## Land Bank Loan

On September 23, 1980, Garry's estate agreed to borrow $950,000 from the Federal Land Bank of Louisville, Kentucky (the Land Bank). The promissory note representing this loan (the Land Bank loan) provided that the following parties were jointly and severally liable for repayment of the loan: (1) Decedent, on behalf of Garry's estate; (2) decedent, individually; (3) the children; and (4) the children's spouses. Repayment of the Land Bank loan was secured by a mortgage of most (but not all) of the 1,804 acres constituting the family farm.

During 1979-93, approximately $1.5 million in interest and principal was paid on the Land Bank loan. This amount was paid from the three bank accounts used by Garry's estate, into which decedent's investment income was also deposited.

## Use of Land Bank Loan Proceeds

Of the $950,000 principal amount of the Land Bank loan, $58,734 was expended on a mandatory purchase of Land Bank stock and other closing costs and fees, leaving net proceeds of $891,266.

At least $616,864 of the $891,266 net proceeds of the Land Bank loan was used to pay the taxes and expenses of Garry's estate. Therefore, at least 65 percent of the gross proceeds of the Land Bank loan (or at least 69 percent of the net proceeds) was used to pay expenses that were the children's expenses, not decedent's expenses.

The $274,402 remaining net proceeds of the Land Bank loan was disbursed in four Land Bank checks. Three of these checks were payable solely to Donald Hendrickson; the fourth was payable collectively to Donald Hendrickson and the other signatories of the note. These checks were then deposited into the Vera Lou Klippel agent account, which was owned solely by the children. The Land Bank's loan closing statement and supplemental disbursement report provide very general information about the use of these funds--that the funds were used to pay "legal fees", "operating", or (apparently) miscellaneous equipment expenses-- but provide no details of those expenses or state on whose behalf the expenses were paid.

Petitioner's estate tax return reported some of the Land Bank stock, with a value of $12,980, as an asset of decedent's estate.

Interest Deductions Claimed by Garry's Estate or Decedent
With Respect to Land Bank Loan

Garry's estate did not claim any interest deductions on its Federal fiduciary income tax returns for most of its fiscal years ending from 1981 through 1994. The estate claimed an interest deduction in excess of $3,000 for only one of these years, the year ending February 1981.

Similarly, decedent's Federal individual income tax returns claim no interest deductions for any of the years 1989-93 (the only years for which decedent's returns are part of the record).

According to the Land Bank's records, the amount of interest paid on the Land Bank loan in the year ending March 1, 1981, was $34,952; the amount of interest paid in each of the years ending from March 1, 1982, to March 1, 1994, varied from $80,523 to $118,476.

Neither Garry's estate nor decedent claimed any Federal income tax deductions for the interest on the Land Bank loan with respect to their 1979-93 taxable years.

Security for Land Bank Loan Included in Decedent's Estate

The outstanding balance of the Land Bank loan at decedent's death was $825,068.

Decedent gave away most of her interest in the family farm land during 1979-93. Therefore, at the time of her death decedent owned little of the land securing the Land Bank loan.

Petitioner's Federal estate tax return reported four tracts of land, aggregating only 137.5 acres, as being subject to a mortgage. A comparison of the description of these tracts on petitioner's return with the Land Bank mortgage reveals that two of the tracts reported on the return--tract 1102, containing 13.33 acres, and tract 1103, containing 26.66 acres--were subject to the Land Bank mortgage. The other two tracts--tracts 1201 and 1202, containing 97.5 acres--were not subject to the mortgage.

Decedent's estate therefore included an interest in two tracts of the family farm land subject to the Land Bank mortgage: tracts 1102 and 1103, aggregating 40 acres.

With respect to the value of the two tracts subject to the mortgage, petitioner's estate tax return reported a separate value for only one of these tracts: A value of $22,661, for tract 1103, or a reported value of $850 per acre. The return did not report a separate value for the other tract, tract 1102; instead, it reported an aggregate value of $78,790, for tracts 1102, 1201, and 1202. These three tracts aggregated 110.83 acres; their reported value was therefore $711 per acre.

The value of the security for the Land Bank loan included in decedent's estate was $32,138, calculated as follows: $22,661 for tract 1103 plus $9,477 for tract 1102 ($711 per acre multiplied by 13.33 acres).

The record contains no evidence of the aggregate fair market value, at decedent's death, of the family farm land securing the Land Bank loan that was not included in decedent's estate.

Miscellaneous Facts Relating to Land Bank Loan

The deeds by which decedent gave her interest in the family farm land to the children during 1979-93 provided that the gifts were made subject to the Land Bank debt and that the debt was expressly assumed by the grantees.

No claims were filed against decedent's estate by the Land Bank or by any of the signatories of the promissory note representing the Land Bank loan.

Payments of principal and interest have continued to be made on the Land Bank loan since decedent's death. As of March 1, 1998, the balance of the Land Bank loan had been reduced to $636,814 from the $825,068 balance at decedent's death.

Petitioner admits that, if decedent had made more than her proportionate share of the Land Bank loan payments, she would have been entitled to contribution from the other signatories of the promissory note under Indiana law.

OPINION

I. Did Decedent Make Taxable Gifts of Investment Income Received by Garry's Estate During 1979-93?

In the statutory notice, respondent determined that decedent, as a beneficiary of Garry's estate, became entitled to

$711,841 of coal royalties, dividends, and interest received by the estate during 1980-92. Respondent also determined that decedent did not exercise her right to receive this investment income, but instead allowed its economic benefit to be enjoyed by the children. Respondent further determined that decedent thereby made indirect gifts of the investment income to the children, which gifts are "taxable gifts" for purposes of section 2503 and the other estate and gift tax provisions of the Code.

After having reviewed petitioner's responses to certain interrogatories, respondent, by amended answer, asserted that decedent had become entitled to an additional $332,945 of the investment income of Garry's estate. Respondent further asserted that decedent similarly made taxable gifts of this additional income to the children. The entire increased deficiency asserted in the amended answer is attributable to the asserted gifts of this additional investment income.[8]

Respondent made several concessions after the amended answer. Respondent now maintains that decedent became entitled to a total of only $999,769 of the investment income of Garry's estate during the period extending from Garry's death in 1979 to

---

[8] With respect to the deficiency determined in the notice, respondent's determination is presumed to be correct; petitioner bears the burden of proving it wrong. See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Respondent bears the burden of proof with respect to the increased deficiency asserted in the amended answer. See Rule 142(a).

decedent's death in 1993.  Respondent also concedes that decedent received $14,303 of this income as distributions from Garry's estate, and that Garry's estate expended $72,266 on expenses related to the production of this income.

As a result of these concessions, respondent now contends that during 1979-93, decedent became entitled to $913,200 of the investment income of Garry's estate, which was neither distributed to decedent nor spent on the costs of earning that income.  Respondent further contends that decedent permitted the children to enjoy the economic benefit of this $913,200, and thereby made aggregate taxable gifts to the children of that amount, also during 1979-93.

The evidence sustains respondent's first contention (and we have so found).  During 1979-93, decedent became entitled to $913,200 of the investment income of Garry's estate, which was neither distributed to decedent nor spent to produce that income. We now consider whether decedent made taxable gifts of all or part of that $913,200 to her children, as respondent further contends.

A.  Relevance of Decedent's Taxable Gifts to This Estate Tax Case

Section 2001(a) imposes the Federal estate tax on the transfer of the "taxable estate" of every decedent who is a citizen or resident of the United States.  Under certain

circumstances, a decedent's taxable estate may be deemed to include property that was given away by the decedent before death. See, e.g., secs. 2036-2038. In this case, however, respondent has not asserted that any of decedent's lifetime gifts should be included in decedent's taxable estate.

Accordingly, respondent has not claimed that any of decedent's $913,200 in investment income should be directly subject to the estate tax, as part of decedent's taxable estate. Nevertheless, the determination of the portion of the $913,200 that was transferred by decedent, during her lifetime, to the children in transactions that constitute "taxable gifts" for gift tax purposes remains relevant to this case. Under section 2001(b), the amount of decedent's post-1976 "taxable gifts" is taken into account in the calculation of decedent's estate tax; the amount of such gifts in part determines the marginal rates of tax imposed on decedent's taxable estate. See Estate of Smith v. Commissioner, 94 T.C. 872 (1990).

Our decision concerning the amount of decedent's lifetime taxable gifts will also determine the amounts to be collected on the assessments of the related gift tax deficiencies determined by respondent. Respondent has undertaken to follow the Court's conclusions in this case in any future collection actions taken with respect to those deficiencies.

B.  Broad Definition of "Taxable Gift"

The Federal gift tax applies to "the transfer of property by gift" by any individual.  Sec. 2501(a).

Section 2503 defines the amount of an individual's "taxable gifts".  Under that section, an individual's taxable gifts for any gift tax period means the total amount of "gifts" made during that period, less certain deductions and exclusions not relevant here (other than the $3,000 or $10,000 annual exclusion for gifts to any individual, set forth in section 2503(b)).

The terms "gift" and "the transfer of property by gift" cover a wide range of transactions.  In Commissioner v. Wemyss, 324 U.S. 303, 306 (1945), the Supreme Court laid down the principle that Congress intended to use the term "gifts" in its broadest and most comprehensive sense.  The Supreme Court in Wemyss noted the "evident desire of Congress to hit all the protean arrangements which the wit of man can devise that are not business transactions within the meaning of ordinary speech". Id.  The Court in Wemyss also stated that donative intent on the part of the transferor is not an essential element in the application of the gift tax to a transfer of property.  See id.

The gift tax provisions of the Code evince--and the gift tax regulations promulgated thereunder carry out--this congressional intent to apply the gift tax to a broad range of transactions. See sec. 2512(b); sec. 25.2511-1(g)(1), Gift Tax Regs.  Section

2512(b) provides that, where property is transferred for less than an adequate and full consideration in money or money's worth, the excess of the value of the property over the value of the consideration <u>shall be deemed a gift</u>.  The purpose of this provision is to protect the estate tax, by treating as taxable gifts transfers of property that deplete what otherwise would have been included in the donor's estate at death.  See <u>Commissioner v. Wemyss</u>, <u>supra</u> at 307-308.

Read literally, section 2512(b) would seem to provide that <u>every</u> transfer of property for inadequate consideration is in part a gift--including a business transaction, in which one party simply got the better of the deal.  Notwithstanding the language of section 2512(b), however, it is clear that the gift tax does not apply to ordinary business transactions.  Section 25.2512-8, Gift Tax Regs., provides:  "a sale, exchange, or other transfer of property made in the ordinary course of business (a transaction which is bona fide, at arm's length, and free from any donative intent), will be considered as made for an adequate and full consideration in money or money's worth."  Because a business transaction meeting this standard is deemed to be made for adequate consideration, it is not a gift for gift tax purposes--even if the consideration received by one of the parties turns out to be inadequate.  See <u>Estate of Anderson v. Commissioner</u>, 8 T.C. 706, 720-721 (1947).

- 33 -

C.  The Parties' Positions--In General

Respondent's position stresses the overall effect of decedent's conduct with respect to the assets decedent received under Garry's will and decedent's share of the investment income generated by those assets during 1979-93.  According to respondent, decedent's conduct with respect to these assets and income both depleted decedent's taxable estate and benefited the children, who were the natural objects of her bounty.

Respondent urges us to remember that although decedent received a bequest from Garry's estate with a value of over $2.15 million, and also became entitled to $913,200 of net investment income during the period between Garry's death and her death, petitioner reported a gross estate of only $1,107,141, a taxable estate of only $272,756, and adjusted taxable gifts of only $313.

Respondent additionally reminds us that because Garry's bequest to decedent qualified for the marital deduction, Garry's estate was not required to pay estate tax on the transfer of 50 percent of its assets to decedent.  Respondent, of course, has no quarrel with this.  However, it is generally assumed that the price to be paid for the tax-free transfer of assets via the marital deduction is the taxation of those assets in the estate of the surviving spouse.  See Estate of Cavenaugh v. Commissioner, 100 T.C. 407, 416 (1993), affd. in part and revd. in part on another ground 51 F.3d 597 (5th Cir. 1995).

Respondent does not contend that decedent had a duty to maximize her taxable estate by investing her assets and income wisely. An individual may consume or even squander her property without making a gift. See Dickman v. Commissioner, 465 U.S. 330, 340 (1984). In addition, respondent recognizes that decedent's repeated use of the gift tax annual exclusion--which enabled decedent to give most of her interest in the family farm land to the children and their spouses, while making only $313 of taxable gifts--was proper. Respondent correctly argues, however, that, if decedent did not consume or squander her investment income but instead transferred the economic benefit of that income to the children (as respondent alleges), decedent made gifts of the income to the children. See id.

On brief, petitioner attempts to address respondent's concerns about the "disappearance" of both the assets decedent was entitled to receive from Garry's estate and the investment income generated by those assets. Petitioner asserts that the approximately $1 million excess of the value of those assets over the value of decedent's gross estate is amply explained by: (1) Decedent's gifts of $532,349 in family farm land during 1979-93 (see supra pp. 9-10); (2) an approximately $85,000 decrease in the value of decedent's interest in certain farm equipment acquired from Garry's estate (see supra p. 13); and (3) an

approximately $500,000 decrease in the value of decedent's interest in the Gibson County coal rights (see supra p. 16).

With respect to the income generated by the assets, petitioner does not dispute that decedent became entitled to $913,200 of net investment income during 1979-93, which was not included in decedent's estate. Petitioner admits that decedent's income was transferred to a Hendrickson family "pool", in which the children had an interest; petitioner also acknowledges that intrafamily transactions are generally presumed to be gifts. Notwithstanding all this, petitioner still maintains that decedent did not make any of the taxable gifts determined by respondent.

Petitioner's position, unlike respondent's, focuses on decedent's asserted motivation for her use of the investment income. As set forth in more detail below, petitioner argues that decedent did not intend to make any gifts, and that she either invested or spent most or all of her income to preserve the family farm. Petitioner additionally argues that, if any of decedent's income was not in fact spent on the family farm, decedent received full consideration for that income in money or money's worth, in the form of a receivable from HEI and the children's provision of services to the farm.

In this context, petitioner notes that Garry's family had lived in Warrick County, Indiana, since 1853 and that decedent

was born and raised in the same area.  Petitioner further notes that Garry engaged in farming in Warrick County for most of his life.

Petitioner also reminds us that Donald Hendrickson testified that decedent loved farming and wanted the family farm to continue after Garry's death.  Donald Hendrickson further testified that Garry had let the farm decline in the years leading up to his death and that at that time farming had already become the difficult business it is today.  Petitioner asserts that decedent and the children therefore had to work and invest together to preserve the family farm and that decedent insisted this be done.

We are of course aware that operating a family farm can be an extremely demanding and daunting task.  We are also aware that in these times a farmer (and his family) can work long and hard, in the most businesslike way, and yet earn no economic profit from the enterprise.

We have no doubt that the family farm was important to decedent and the children, for many laudable reasons.  The facts of this case, however, do not fit the story petitioner's argument constructs around them.  Petitioner's argument largely explains what happened to the assets decedent received from Garry's estate.  However, it fails to explain what happened to the income generated by those assets.

Petitioner claims that decedent spent most or all of her investment income on the family farm, either as part of a bona fide business venture with the children or for her own account and pleasure. We have found that decedent became entitled to $913,200 of net investment income during 1979-93. However, we have also found that the aggregate net cash needs of the family farm during that period did not exceed $239,184. Therefore, even if decedent had supplied all the cash needed by the farm, this would only have accounted for about one-fourth of decedent's investment income from Garry's estate. Accordingly, we conclude that most of decedent's income simply was not spent on the family farm, notwithstanding petitioner's contentions.[9] We also conclude that decedent did not receive the consideration claimed by petitioner for any investment income not spent on farm expenses.

In effect, decedent's conduct or acquiescence during the lengthy period of administration of Garry's estate--both as a beneficiary and as personal representative--prevented the

---

[9] Donald Hendrickson testified at trial that he personally borrowed about $600,000 for the expenses of the family farm and spent more of his own money than that on family farm operations. In light of our finding that the net cash needs of the family farm during 1979-93 did not exceed $239,184, we conclude it is quite unlikely that Donald Hendrickson spent such sums on the family farm--although he may well have spent that much on some of the other Hendrickson family farming operations he also managed, including a farm owned by the children that was contiguous with parts of the family farm.

investment income generated by the estate's assets from reaching

decedent and becoming part of decedent's taxable estate.  As

noted above, Garry's bequest to decedent qualified for the

maximum marital deduction then allowable for Federal estate tax

purposes.  Decedent's effective deflection away from herself of

her marital share of the investment income of Garry's estate is

inconsistent with the policies underlying the allowance of the

marital deduction on the transfer of the assets giving rise to

that income.  See sec. 20.2056(b)-4(a), Estate Tax Regs. (in

determining the value of an interest in property passing to the

spouse for purposes of the marital deduction, account must be

taken of the effect of any material limitations upon the

surviving spouse's right to income from the property);[10] sec.

20.2056(b)-5(a), Estate Tax Regs. (in order for an interest in

property to qualify as a deductible life estate under section

---

[10] The promulgation, in the wake of Commissioner v. Estate of Hubert, 520 U.S. 93 (1997), of proposed regulations addressing in detail the circumstances in which the use of estate income to pay administration expenses will be considered a material limitation on the value of the residue for purposes of the estate tax charitable and marital deductions, see secs. 20.2055-1(d)(6), 20.2056(b)-4(e), Proposed Estate Tax Regs., 63 Fed. Reg. 69248, 69250-69251 (Dec. 16, 1998), evidences the continuing importance of this issue.  The "qualified terminable interest property" (QTIP) rules, enacted in 1981--after Garry's death in 1979--also evidence Congress' continuing concern that the surviving spouse receive all income from any property qualifying for the marital deduction.  See sec. 2056(b)(7)(B)(ii)(I) (property is not QTIP unless the surviving spouse is entitled to all the income from the property, payable annually or at more frequent intervals, or has a usufruct interest for life).

2056(b)(5), the surviving spouse must be entitled for life to all the income from the interest, or a specific portion of the interest).

For this and the other reasons set forth in more detail below, we conclude that decedent made taxable gifts of her investment income as asserted by respondent on brief, except to the limited extent that income was spent on family farm expenses properly attributable to decedent.

D.  Petitioner's Primary Argument--Decedent's Transfer of Investment Income Was a Bona Fide, Ordinary Business Transaction

Petitioner's primary legal argument is that decedent transferred her investment income in the ordinary course of business, within the meaning of section 25.2512-8, Gift Tax Regs. Petitioner therefore asserts that decedent did not make taxable gifts of any of her investment income--regardless of the shortfall in the consideration she received for it in money or money's worth.

More particularly, petitioner claims that shortly after Garry's death, decedent and the children formed a partnership to operate the family farm.  According to petitioner, under the terms of the partnership agreement, decedent was entitled to 50 percent of the income or loss of this partnership; the children were entitled to equal one-third shares of the other 50 percent. Also according to petitioner, decedent and the children agreed to

contribute their shares of the investment income of Garry's estate to the partnership, to be used as necessary to support the farming activities. Petitioner further asserts that, as matters turned out, decedent's $913,200 of investment income was in fact contributed to the partnership to support the losses of the farm operations.

As an initial response to petitioner's argument, we note that there was no written partnership agreement among decedent and the children concerning the operation of the family farm. In addition, the record contains no Forms 1065 (or other partnership tax reporting forms) relating to the claimed family farm partnership--although at least three other pass-through entities in which decedent or the children had an ownership interest filed Federal income tax forms.

We also note that petitioner's Federal estate tax return did not report, as one of the assets of decedent's estate, a partnership interest in the family farm. It also did not report as an asset any of the three bank accounts petitioner claims were used to conduct the business of the farm partnership. Moreover, with respect to any equipment of the partnership, petitioner's estate tax return reported less than $15,000 worth of farm equipment as assets of decedent's estate, all of which had been inherited by decedent from Garry in 1979. Furthermore, with respect to any income or loss of the claimed farm partnership,

none of decedent's individual income tax returns for 1989-93 (the only income tax returns of decedent in the record) reports any income or loss from a partnership.

Finally, we note that for the fiscal years ending in February 1985 and February 1986, almost all family farm income reported by Garry's estate was rental income. For the fiscal years ending in 1987 through 1993, the estate reported its farm income simply as "other income", but it also reported that the principal activity of the family farm was "land rental". For the fiscal year ending in February 1994, the estate reported its farm income on Form 4835, Farm Rental Income and Expenses. At trial, Donald Hendrickson testified that in 1984 or 1985 he began farming various portions of the family farm land formerly rented to tenant farmers, and that by 1992 he was farming almost all of the family farm land. He also testified that the other children and he were conducting this farming as "tenants".

All these facts strongly suggest that there was no family farm partnership of any kind among decedent and the children, much less a partnership that conducted the farming operations on the family farm land. However, even if we assume that a farm partnership existed in the form claimed by petitioner--and also assume that decedent transferred her net investment income to that partnership--decedent's transfers would not meet the "bona

fide, at arm's length, and free from any donative intent" standard set forth in section 25.2512-8, Gift Tax Regs.

Petitioner asserts that decedent contributed her investment income to the claimed farm partnership in exchange for her 50-percent partnership interest. If this were true, decedent's transfers would not meet the standard set forth in the regulation, for the following reason. Decedent became entitled to $913,200 of investment income during 1979-93, net of distributions and expenses. Petitioner claims this entire $913,200 was contributed to the family farm partnership, for use in the operations of the family farm. However, on the basis of the Federal fiduciary income tax returns filed by Garry's estate, we have found that the aggregate net cash needs of the family farm for 1979-93 did not exceed $239,184; decedent's 50-percent "partnership share" of this loss would not exceed $119,592.

Therefore, if the farm partnership existed as claimed by petitioner, decedent would have contributed at least $793,000 (i.e., $913,200 less $119,592) in investment income to the partnership, in excess of her share of the cash needs (or losses) of the partnership. There is no evidence that this excess is accounted for by any assets acquired by the claimed partnership, or by any value of decedent's claimed partnership interest itself. As we have found, the family farm stopped purchasing farm equipment during the early 1980's, and the farm's personal

property had been almost completely depreciated at decedent's death.  Moreover, petitioner itself claims that decedent's farm partnership interest was worthless at that time.

Petitioner argues that any excess contributions of capital made by decedent were offset by contributions of services made by the children.  According to petitioner, as a result of these contributions of services, the family farm partnership qualifies as an ordinary business transaction under the long history of favorable case law dealing with the formation of family partnerships.

In making this argument, petitioner relies heavily on our decision in Fischer v. Commissioner, 8 T.C. 732 (1947).  In Fischer, we held that the formation (by a father and two sons) of a partnership to carry on an established business owned by the father did not result in taxable gifts from father to sons, where the father contributed more capital than the sons, but the sons planned to contribute more future services than the father.

Petitioner argues that the facts of Fischer are "remarkably similar" to the facts of this case.  In response, we note that in Fischer, unlike the case at hand:  (1) There was a written partnership agreement; (2) partnership tax returns were filed; (3) the partners reported partnership earnings on their individual income tax returns; and (4) for these reasons (among others) we found that a valid, bona fide partnership existed.

We also note that in <u>Fischer</u> there was a vastly different relationship among the services provided by the children, the capital contributed by the parent, and the partnership interests received. In <u>Fischer</u> the two sons had worked full time in the family business for many years before the partnership was formed; they also continued to provide vital full-time services to the partnership thereafter.

In this case, Donald Hendrickson testified at trial that he worked about 20 hours per week for the family farm during 1979-93 and that his services had a value of approximately $15 per hour. Donald Hendrickson also testified that his sister, Mrs. Klippel, performed approximately 15 to 20 hours per week of bookkeeping services for the family farm during the same period, with a value of approximately $8 per hour. Finally, Donald Hendrickson testified that his brother, James O. Hendrickson, performed very few services for the family farm.

Donald Hendrickson also testified that during 1979-93 he was employed full time as the judge of the Warrick County Circuit Court. In addition, Donald Hendrickson had many other business interests, including other farming interests. Moreover, Mrs. Klippel also had another job, and she testified at trial that she spent only 10 to 12 hours per week working for the family farm. For all these reasons, we have found that: (1) Donald Hendrickson performed not more than 10 hours per week of services

for the family farm with a value of $15 per hour; (2) Mrs. Klippel performed not more than 10 hours of services per week with a value of $8 per hour; (3) James O. Hendrickson performed no material services for the family farm; and (4) the value of the services performed by the children for the family farm during 1979-93 did not exceed $172,500.

In this case the value of the part-time services performed by the children is therefore far less than the $913,200 assertedly contributed by decedent to the partnership or the $793,000 excess of decedent's contributions over 50 percent of the partnership's aggregate cash needs. This imbalance between the capital contributed by the parent and the services contributed by the children suggests that our analysis in Gross v. Commissioner, 7 T.C. 837 (1946) (formation of family partnership created gift, even though children agreed to contribute substantial services, where partnership's income was primarily attributable to parent's contributed capital), applies to this case, rather than our analysis in Fischer.

Moreover, in this case the relationship between the services allegedly performed by the children and the interests they allegedly received in the farm partnership serves as further proof that if the farm partnership existed, any transfers by decedent to that partnership were neither at arm's length nor free from donative intent. The value of the services performed

by Mrs. Klippel was approximately one-half the value of the services performed by Donald Hendrickson; James O. Hendrickson performed no material services.  Despite these differences, however, each of the three children received (also according to petitioner) an equal 16-2/3-percent share of the partnership's profits and losses.  This asserted awarding of equal partnership shares for vastly unequal work is further evidence that the family farm partnership, if it existed, was motivated by feelings of family solidarity, rather than ordinary business considerations.  See Heringer v. Commissioner, 235 F.2d 149, 151 (9th Cir. 1956) (parents' transfer of farm land to corporation owned by parents and their 11 children held to be gift; Court of Appeals found it noteworthy that all 11 children received stock in the corporation, but only 9 of the children were partners in the operating partnership that actually farmed the land), vacating and remanding 21 T.C. 607 (1954).

Above all, in interpreting the "ordinary business transaction" exception to the gift tax, the pertinent inquiry is whether the transaction is a genuine business transaction, as distinguished from the marital or family type of transaction.  See Estate of Anderson v. Commissioner, 8 T.C. at 720.  In the case at hand, the alleged partners were a mother and her three children.  The general rule is that intrafamily transactions are subject to special scrutiny and presumed to be gifts.  See

Harwood v. Commissioner, 82 T.C. 239, 259 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986).  There is no evidence of any arm's-length bargaining of decedent with her children that suggests that business purposes rather than family relationships were the impelling considerations.  Also, as noted above, decedent's alleged contributions to the partnership substantially exceeded her share of the partnership's losses; the value of the services allegedly performed by the children was relatively small compared to the value of decedent's capital contributions; and the children allegedly received equal shares in the partnership, although they provided substantially unequal services.[11]

For all these reasons, we find that decedent did not make any transfers to the asserted family farm partnership that were bona fide, at arm's length, and free from donative intent.

---

[11] We again note that in 1984 or 1985, Donald Hendrickson began farming the family farm land formerly rented to certain tenant farmers, and that by 1992, Donald Hendrickson was farming substantially all the family farm land.  Donald Hendrickson testified that the other children and he were conducting this farming as tenants; he also testified that whatever profit he made from farming the family farm land he divided 50 percent to decedent and 50 percent to the children.

As set forth supra p. 20, the annual gross income Garry's estate received from the entire family farm during 1986-93, when substantial acreage was being farmed by Donald Hendrickson, was far less than the farm rental income the estate received during 1979-85, when only a part of the farm was being rented to tenant farmers.  This further suggests that if the alleged family farm partnership existed, it was not an arm's-length arrangement.

Accordingly, we hold that the "ordinary business transaction" exception does not apply to this case.

E. Petitioner's Secondary Argument--Decedent Either Spent Investment Income on Her Own Expenses or Received Full Consideration for Any Income That Benefited Children

Petitioner asserts that, even if the ordinary business transaction exception does not apply, decedent still did not make taxable gifts of any of her $913,200 in investment income. According to petitioner, whether or not a formal partnership existed, most or all of decedent's income from Garry's estate was used to pay decedent's share of the expenses of the family farm. To the extent decedent's income was not used to pay farm expenses, petitioner further argues that decedent received full consideration for that income, in the form of a $166,500 receivable from HEI and the children's provision of services to the family farm.

In our consideration of petitioner's primary argument, we simply assumed that decedent transferred her net investment income to the asserted family farm partnership. We now try to determine what decedent (or Garry's estate) actually did with decedent's net investment income. Although the record in this case is extensive, it is unfortunately quite difficult to make this determination, in part because there was extensive commingling of estate and other funds among decedent and the children.

1.  Petitioner's Estate "Accounting"

Petitioner's primary evidence concerning the use of decedent's investment income is a purported "accounting" of Garry's estate, which petitioner introduced at trial.  According to petitioner, its accounting--an approximately 125-page document--lists every deposit made to and every payment made from (other than interaccount transfers) the three bank accounts petitioner claims were used to conduct the business of the family farm.  Petitioner alleges these three accounts were also used to conduct the other business of Garry's estate.  Therefore, petitioner asserts that the bank account information summarized in the accounting proves how all income of Garry's estate was spent, including any income received by the estate for the benefit of decedent.

We do not agree with petitioner's characterization of the accounting.  For the reasons set forth below, the accounting is not sufficiently complete or reliable to prove how all of decedent's investment income (or all income of Garry's estate) was spent.  Moreover, whether we treat the accounting as an admission or evaluate it in light of the other evidence in the record, petitioner's accounting in fact shows that substantial amounts of decedent's investment income were spent on the children's expenses, not decedent's expenses.

2. Unreliability of Petitioner's Accounting

There are many reasons to question the reliability of petitioner's purported accounting of Garry's estate. The accounting covers thousands of transactions over a 14-year period from 1979 to 1993. The accounting generally identifies these items, however, only by the date of receipt or payment and the name of the claimed payor or payee. In addition, the accounting was prepared by Donald Hendrickson, not by an outside accountant, and he did not keep the records on which the accounting was based. Moreover, petitioner admits that the Hendrickson family never had a plan to keep a running list of whose money was spent during the operation of the various Hendrickson family businesses.

Under these circumstances, it is not surprising that at trial respondent proved, by reference to bank records and canceled checks, that several transactions involving the three bank accounts used by Garry's estate were either omitted from, inaccurately described in, or inaccurately classified by, petitioner's accounting, including one transaction involving $100,000.

There is a more fundamental problem with petitioner's accounting, however, than the errors and omissions detected by respondent. The three bank accounts described in the accounting were not used solely to receive the joint income, and to pay the

joint obligations, of decedent and the children. They were also used to receive income that belonged solely to the children and to pay obligations for which the children were solely responsible.

Because of this commingling, the proper classification of the thousands of transactions listed in petitioner's accounting as "children's expenses", "joint expenses", or "decedent's expenses" is of vital importance. The classifications presented in petitioner's accounting were performed entirely by Donald Hendrickson. Because the books reviewed by Donald Hendrickson had classified the bank account items only as money coming in or money going out, he was required to perform these classifications, and the resulting allocations, largely on the basis of his recollections of the purposes of the transactions. In addition, Donald Hendrickson generally reviewed only check registers, rather than the canceled checks. Moreover, we again note that the accounting concerns thousands of transactions over 14 years and that Donald Hendrickson did not himself keep the records on which the accounting is based.

For all these reasons--and without suggesting any dishonesty--we believe that petitioner's accounting is not reliable enough either to establish the precise amount of decedent's expenses paid by Garry's estate or to serve more generally as a complete "accounting" of Garry's estate.

3. Petitioner's Accounting Shows That Much of Decedent's Investment Income Was Spent on Children's Expenses

Although petitioner's "accounting" is not sufficiently reliable to show exactly how the income of Garry's estate was spent, it is still quite useful. Whether we treat the accounting as an admission by petitioner or evaluate it in light of the other evidence in the record, the accounting corroborates our conclusion that the bulk of decedent's investment income was not spent on the family farm. It also strongly suggests that much of decedent's income was in fact used to pay the children's expenses, rather than decedent's expenses.

Petitioner's accounting clearly shows that at least $443,000 of decedent's funds was not used to pay decedent's expenses during 1979-93. It also clearly shows that the three bank accounts of Garry's estate summarized in the accounting were used to pay millions of dollars of the children's expenses during 1979-93. For example, petitioner's accounting shows that over $1.5 million of expenses explicitly identified as "Children's Expenses" was paid from the estate's accounts during 1979-93. The accounting also shows that approximately $1,575,000 of principal and interest on the Land Bank loan was paid from the estate's accounts during the same period. Because petitioner admits that most of the proceeds of the Land Bank loan were used to pay the children's expenses, petitioner concedes on brief that

82.5 percent of these loan payments (approximately $1,340,000) was the children's expenses.

As a result, petitioner's own accounting shows that the bank accounts of Garry's estate were used to pay over $2.8 million of the children's expenses during 1979-93. It also shows (as noted above) that those bank accounts received over $443,000 of decedent's funds that were not used to pay decedent's expenses. For these reasons, petitioner's accounting strongly suggests that large amounts of decedent's investment income were used to pay the children's expenses during 1979-93.[12]

### 4. Decedent Did Not Receive Consideration Claimed by Petitioner for Any Income Not Used To Pay Farm Expenses

Petitioner argues that, even if some of decedent's investment income was not used to pay family farm expenses, decedent did not make taxable gifts of that income. According to petitioner, decedent received full consideration for any income not spent on the farm, in the form of: (1) A $166,500 receivable from HEI; and (2) the children's performance of substantial services for the family farm.

With respect to the HEI receivable, we note that Garry's estate tax return and petitioner's estate tax return each

---

[12] Petitioner essentially admits on brief that the amount of the children's expenses paid out of the three bank accounts of Garry's estate exceeded the amount of the children's income received by those accounts.

reported a receivable from HEI as an asset of the estate. Petitioner claims that the two returns did not refer to the same receivable. According to petitioner, HEI paid off the $359,534 receivable reported on Garry's estate tax return over several years following Garry's death, and the $166,500 receivable reported on petitioner's return was a new asset acquired subsequently by Garry's estate on behalf of decedent.

The evidence does not support petitioner's assertions. To the contrary, it shows that the same receivable was reported on both returns. Having found that none of decedent's funds were used by Garry's estate to acquire a receivable from HEI during 1979-93, we have also found that decedent received no consideration for her investment income in the form of a receivable from HEI.

With respect to the children's provision of services to the family farm, we have found that Donald Hendrickson and Mrs. Klippel performed some services during 1979-93 with respect to the operations of the family farm. However, we now hold that these services do not constitute "consideration" for decedent's investment income within the meaning of the gift tax, for the following reasons.

The children owned 50 percent of the family farm land after Garry's death in 1979. Their ownership of the farm land then increased continuously until 1992, when it reached 95.32

percent.  Therefore, to a great extent, the children's services were performed on (or with respect to) their own land and did not substantially benefit decedent.

In addition, the children were, of course, decedent's children.  The children worked only part time for the family farm, and their services were not of great value.  To the extent the children's services benefited decedent, the services were well within the range of activities children in the prime of life normally perform for their elderly parents, out of love and affection.  Moreover, there is no credible evidence that the children's services were bargained for; i.e., that decedent agreed at arm's length to exchange some of her investment income for any services performed.

A transfer of property does not constitute a gift to the extent consideration in money or in money's worth is received in exchange therefor.  See sec. 2512(b).  However, in order for consideration to be taken into account for gift tax purposes, it must benefit the transferor; detriment to the transferee is not sufficient.  See Commissioner v. Wemyss, 324 U.S. at 307-308.  In addition, the consideration must be bargained for, at least in the family context.  See Rohmer v. Commissioner, 21 T.C. 1099, 1103-1104 (1954) (wife's asserted professional services rendered with respect to husband/author's novel were not consideration for

husband's transfer of certain literary rights, in the absence of proof that the services were bargained for).

As we have noted, the children's services were performed primarily with respect to their own land, and there is no evidence their services were bargained for. Therefore, we find that the children's services do not constitute consideration for purposes of the gift tax; they do not offset any use of decedent's income for the benefit of the children.

5. No Land Bank Loan Payments Were Decedent's Expenses

Petitioner admits that 65 percent of the proceeds of the Land Bank loan was used to pay the taxes and administration expenses of Garry's estate. Petitioner further admits that under Garry's will the children were responsible for these payments.

Petitioner claims that the remaining 35 percent of the loan proceeds was used to pay the expenses of the family farm. Because petitioner believes one-half of the farm expenses were decedent's expenses, petitioner claims that 17.5 percent of the loan proceeds was used to pay decedent's expenses. As a result, petitioner asserts that 17.5 percent of the Land Bank loan payments made during 1979-93 (approximately $276,000) should be considered to be decedent's expenses, the payment of which by decedent would not be a taxable gift.

The evidence suggests that even more than 65 percent of the loan proceeds was used to pay the taxes and administration

expenses of Garry's estate.  For this reason, we have found that "at least" 65 percent of the proceeds was so used.

The evidence concerning the net loan proceeds not used to pay such taxes and expenses is less clear.  The Land Bank's records provide few details about the use of these proceeds.  It is clear, however, that some of these proceeds were disbursed by the Land Bank using checks payable solely to Donald Hendrickson. It is also clear that all net proceeds not used to pay the taxes and expenses of Garry's estate were deposited in the Vera Lou Klippel agent account, which was owned solely by the children. In addition, other than the unsubstantiated testimony of Donald Hendrickson, there is no evidence that more than a de minimis amount of the loan proceeds was used to pay expenses of the family farm or was otherwise received by or used for the benefit of decedent.[13]

The note representing the Land Bank loan provided that decedent was jointly and severally liable for repayment of the loan.  However, the deeds by which decedent gave away most of her interest in the family farm land during 1979-93 expressly provided that the grantees assumed the Land Bank debt to which the transferred land was subject.  As a result of these

---

[13] Petitioner's estate tax return did report some of the Land Bank stock, with a value of $12,980, as an asset of the estate.

assumptions by the children (and their spouses), decedent effectively became a guarantor, rather than a co-obligor, with respect to most of the Land Bank loan.

In addition, the evidence shows that neither decedent nor Garry's estate claimed any deductions for Federal income tax purposes with respect to the interest on the Land Bank loan. This strongly suggests that the signatories to the loan did not consider decedent to be the true obligor of the loan. See sec. 20.2053-6(f), Estate Tax Regs. (an enforceable agreement between spouses concerning the allocation of their joint income tax liability may limit the amount of income taxes allowable as a claim against the estate, notwithstanding the spouses' joint and several liability for the taxes to the Commissioner).

For all these reasons we find that the Land Bank loan payments were not decedent's expenses.

6.  Decedent's Income Was Not Used To Pay Decedent's Share
    of Expenses of Any Business Other Than Family Farm

The bulk of petitioner's argument and evidence concerns the asserted use of decedent's investment income to pay the expenses of the family farm, to purchase an HEI receivable, or to induce the children to perform services for the family farm.  On brief, however, petitioner attempts to muddy the waters by suggesting that some of decedent's funds may have been used to pay decedent's share of the expenses of Hendrickson family businesses

other than the family farm.  Petitioner's brief even asserts at one point that the family, including decedent, pooled all its resources and contributed them to the family businesses, including the family farm.

We reject this attempt to confuse the issues.  There simply is no evidence that decedent's investment income was used to pay decedent's share of the expenses of any family business other than the family farm.  Indeed, elsewhere in its brief petitioner states that "There is no testimony from any party that Ona's [decedent's] money was not used for the farm."[14]  By contrast, there is a great deal of evidence that decedent and the children did not pool all their assets and in fact owned several business interests separately.  For example, although decedent owned the family farm land as a tenant in common with the children, it is undisputed that decedent also owned other farm land outright and that she treated the income from that land as her separate property.  As another example, the parties have stipulated that the children had a farming partnership, in which decedent was not a partner; they have also stipulated that Donald Hendrickson, his wife, and his son owned a farming corporation, in which decedent was not a shareholder.

---

[14] Respondent did not present any witnesses at trial.

For all these reasons, we find that none of decedent's investment income was used to pay decedent's share of the expenses of any family business other than the family farm.

F. <u>Decedent Gave Her Investment Income to Children As Asserted by Respondent on Brief, Except to Limited Extent Income Was Used To Pay Decedent's Share of Expenses of Family Farm</u>

On the basis of our conclusions set forth above and our review of the entire record, we find that decedent made gifts of her $913,200 in investment income to the children as asserted by respondent on brief, with one exception.

Contrary to petitioner's position, we have found that most of decedent's investment income was <u>not</u> expended on the family farm. Contrary to respondent's position, however, we find that at least <u>some</u> of decedent's income was used to pay family farm expenses; we also find that at least <u>some</u> of those expenses were properly attributable to decedent. Because the evidence has not established the precise amount of decedent's farm expenses, we believe we should estimate that amount, and reduce decedent's gifts correspondingly, under the principle set forth in <u>Cohan v. Commissioner</u>, 39 F.2d 540 (2d Cir. 1930). See <u>Pascarelli v. Commissioner</u>, 55 T.C. 1082, 1087-1088, 1096 (1971), in which we applied the <u>Cohan</u> principle to estimate an amount of transferred funds that did not constitute a gift, because it was used by the

transferee, at the direction of the transferor, to pay the transferor's expenses.

We have found that the net aggregate cash needs of the family farm from 1979 to 1993 did not exceed $239,184. We believe, however, that even if decedent's investment income had been used to pay this entire amount, only a portion of the amount should be considered to be decedent's expenses, for the following reason.

Petitioner asserts that an individual may consume her own income as she wishes, without making a taxable gift. Petitioner also claims that decedent deeply desired to preserve the family farm. Accordingly, petitioner asserts that decedent, who had both emotional and ownership interests in the family farm land, could have spent as much money as she wanted on the farm without making a taxable gift--even if she received no pecuniary return on her investment.

As a general principle, petitioner is undoubtedly correct that an individual is under no duty to invest her property productively. Indeed, an individual may consume or even squander her property without making a gift. See Dickman v. Commissioner, 465 U.S. at 340. However, when an individual transfers her property (or the use of her property) to members of her family without receiving adequate consideration for it in money or

money's worth, she has made a gift.  See sec. 2512(b); Dickman v. Commissioner, supra.

More relevant to this case, one may spend her money on her own real estate without making a gift.  However, when she spends her funds on someone else's real estate, without receiving adequate consideration, she has made a gift to that other person. See Pascarelli v. Commissioner, supra at 1099 (man's payment of landscaping and renovation expenses for house owned solely by woman held to be gift from man to woman, even though both lived in the house).

Shortly after Garry's death, decedent began a program of giving her interest in the family farm land to the children.  As a result, decedent's ownership of the farm land declined from 50 percent of the land in 1979 to 4.68 percent in 1992.  For this reason, only a small portion of the expenses of the family farm represents expenses properly attributable to decedent for gift tax purposes.

On average, decedent owned approximately 31 percent of the family farm land during the period in issue, 1979-93.  The aggregate net cash needs of the family farm during this period did not exceed $239,184.  We therefore estimate that during 1979-93, approximately $74,147 (31 percent of $239,184) of decedent's investment income was used to pay family farm expenses properly attributable to decedent.  Dividing this amount by the 15

calendar years in the period at issue produces an amount of approximately $4,950 per year.

We therefore hold that during 1979-93, decedent gave her $913,200 in investment income to the children as asserted by respondent on brief, except that the amount of the gifts asserted by respondent should be reduced by $4,950 per year[15] on account of moneys spent by Garry's estate on decedent's share of the cost of operating the family farm.[16]

We realize that this approach only roughly estimates the amount of decedent's investment income actually spent on family farm land owned by decedent during each of the 15 years in issue. However, the Cohan rule recognizes that the true injustice would be to take an all-or-nothing approach, because of a failure of proof.[17]  It also contemplates that we may bear down, if we so

_____

[15] In applying the unused annual gift tax exclusions to which decedent was entitled (see supra p. 10), this amount should be divided equally among the three children; i.e., the asserted gifts to each of the three children should be reduced by $1,650 per year.

[16] As discussed above, we have not treated any of the Land Bank loan payments as decedent's expenses.  However, we have found that the amount of decedent's investment income used to pay decedent's share of the family farm expenses during 1979-93 was equal to decedent's full share of the aggregate net cash needs of the family farm for that period.  For this reason, if we had found that any Land Bank loan proceeds had been used to pay decedent's share of the farm expenses, we would also have found that less of decedent's investment income had been so used.

[17] See Gerling Intl. Ins. Co. v. Commissioner, 98 T.C. 640,
(continued...)

choose, on the taxpayer whose inexactitude is of his own making. See <u>Cohan v. Commissioner</u>, 39 F.2d at 543-544.

We again note that the funds of Garry's estate were commingled with funds owned solely by the children. For this and other reasons, petitioner's purported accounting of Garry's estate is unreliable and simply does not permit us to determine the amount of family farm expenses actually paid with decedent's funds. It also falls far short of the kind of accounting usually expected of a fiduciary with respect to the funds under his control.

## II. <u>Is Petitioner Entitled To Deduct a Portion of Land Bank Loan as Unpaid Mortgage?</u>

In 1980, Garry's estate agreed to borrow $950,000 from the Land Bank. According to the promissory note, eight parties (including decedent individually and as personal representative of Garry's estate, the children, and the children's spouses) were jointly and severally liable for repayment of the Land Bank loan. These parties also executed a mortgage to secure the loan. The

---

[17](...continued)
659 (1992), where, after applying the rule set forth in <u>Cohan v. Commissioner</u>, 39 F.2d 540 (2d Cir. 1930), we wrote that "We are satisfied that these seemingly arbitrary holdings comport with the admonition of Judge Learned Hand in <u>Commissioner v. Maresi</u> [citation omitted], that 'The one sure way to do injustice * * * is to allow nothing whatever upon the excuse that we cannot tell how much to allow'."

mortgage covered most (but not all) of the 1,804 acres constituting the family farm.

At decedent's death, the outstanding balance of the Land Bank loan was $825,068. Petitioner claimed on the estate tax return that this entire balance was deductible from decedent's gross estate, in part as a "claim against the estate" under section 2053(a)(3) and in part as an "unpaid mortgage" under section 2053(a)(4). On brief, petitioner concedes that its original position was incorrect. Petitioner now seeks a deduction only for an "unpaid mortgage" under section 2053(a)(4) in the amount of $88,109. Respondent maintains that no deduction is allowable.

Section 2053(a)(4) allows a deduction from the gross estate for "unpaid mortgages" on property. The mortgage for the Land Bank loan is unquestionably an unpaid mortgage, to the extent of the $825,068 outstanding balance at decedent's death. However, the limitations on the unpaid mortgage deduction thwart even petitioner's reduced claim, as explained below.

A. <u>Value of Security Included in Decedent's Estate</u>

Section 2053(a)(4) by its terms applies to an unpaid mortgage on property "where the value of the decedent's interest therein, undiminished by such mortgage * * * is included in the value of the gross estate". We have interpreted and applied this language to hold that where the value of the property securing

the mortgage is <u>not</u> included in the gross estate, the mortgage is not deductible under section 2053(a)(4).  See <u>Estate of Courtney v. Commissioner</u>, 62 T.C. 317, 323-324 (1974).

It is not entirely clear how section 2053(a)(4) should be applied when only a part of the security for a mortgage is included in a decedent's gross estate.  We have held, however, that the deduction may in no event exceed the amount of the security included in the estate.  See <u>Estate of Fawcett v. Commissioner</u>, 64 T.C. 889, 897 (1975).

According to petitioner, decedent's estate included some of the land subject to the Land Bank mortgage, with a fair market value at decedent's death of $101,451.  Because the original principal amount of the Land Bank loan was $950,000, petitioner asserts the land included in decedent's estate represented 10.68 percent (i.e., $101,451 divided by $950,000) of the security for the loan.  As a result, petitioner also asserts it is entitled to a section 2053(a)(4) deduction in an amount equal to 10.68 percent of the $825,068 balance outstanding at decedent's death, or $88,109.[18]

---

[18] In performing these calculations, petitioner apparently assumed that the value, at decedent's death, of all the security for the Land Bank loan was equal to the $950,000 original principal amount of the loan.  The record, however, contains no evidence of the value of the land securing the loan that was not included in decedent's estate.

Petitioner's estate tax return reported four tracts of land as being subject to a mortgage, with an aggregate reported value of $101,451. Petitioner's brief asserts that the mortgage referred to was the Land Bank mortgage. However, by comparing the description of the four tracts on petitioner's estate tax return with the Land Bank mortgage, we have found that only two of the tracts reported on the return--tract 1102, containing 13.33 acres, and tract 1103, containing 26.66 acres--were in fact subject to the mortgage.

With respect to the value of the tracts subject to the Land Bank mortgage, petitioner's return reported a separate value for only one of these tracts (a value of $22,661, for tract 1103). The return reported a combined value of $78,790 for three other tracts, including tract 1102, the second tract subject to the Land Bank mortgage. By assuming that these three tracts had the same per-acre value, we have estimated that the value of tract 1102 was $9,477.

For all these reasons, we have found that only $32,138 of the security for the Land Bank loan was included in decedent's estate. Therefore, petitioner's section 2053(a)(4) deduction could in no event exceed $32,138--even if the other requirements set forth below were satisfied. See Estate of Fawcett v. Commissioner, supra at 897.

B. Uncertainty That Land Bank Loan Will Ever Be Paid by Decedent's Estate

An item may be deducted under section 2053 even if its exact amount is not known, provided it is ascertainable with reasonable certainty, and will be paid. See sec. 20.2053-1(b)(3), Estate Tax Regs. However, no deduction may be taken on the basis of a vague or uncertain estimate, or for a debt that will not in fact be paid. See id.; Estate of Courtney v. Commissioner, supra at 319-323.

As Donald Hendrickson testified at trial, if decedent had paid more than her allocable share of the Land Bank loan, she would have been entitled to seek contribution from her co-obligors. As explained below, the value of decedent's contribution rights must be taken into account in determining the allowable amount of petitioner's deduction for the Land Bank loan. However, under the circumstances of this case, petitioner has not established (and it is impossible for us to determine) the value of those contribution rights. For this reason (and the other reasons discussed below), it is impossible to estimate petitioner's liability for the Land Bank loan with reasonable certainty, and no deduction is allowed.

1. Petitioner's Section 2053 Deduction Must Be Reduced on Account of Decedent's Contribution Rights

Decedent individually was but one of eight parties who were jointly and severally liable for repayment of the Land Bank loan.

As a result of this joint liability, decedent would have been entitled under Indiana law to payments from her co-obligors, if she had paid more than her share of the Land Bank loan.  See Ind. Code Ann. sec. 26-1-3.1-116(b) (Michie 1999).

The purpose of the deduction for unpaid mortgages (and generally for claims against the estate) is to ensure that the estate tax is imposed on the net amount of wealth a decedent can transmit to his or her heirs.  See Estate of Courtney v. Commissioner, supra at 321.  To achieve this purpose, where a decedent was jointly and severally liable for a debt at the time of death, the decedent's estate is not allowed to deduct the entire debt; instead, the estate's section 2053 deduction is adjusted to take account of the decedent's right of contribution from his co-obligors.  See Parrott v. Commissioner, 7 B.T.A. 134 (1927), affd. 30 F.2d 792 (9th Cir. 1929).  This may be done directly, by limiting the decedent's section 2053 deduction to the amount of the joint and several debt, less the value of the decedent's contribution rights.  It may also be done indirectly, by allowing the decedent a deduction for the full amount of the debt, but by including the value of the decedent's contribution rights in the value of the gross estate.  See id. at 138.

In this case, the value of decedent's right to seek contribution has not been included in decedent's gross estate. Therefore, the amount of petitioner's section 2053 deduction must

be adjusted to take into account the value of decedent's contribution rights.

    2.  The Value of Decedent's Contribution Rights Cannot Be Determined

Of course, it is not always easy to determine the value of contribution rights.  In some cases, we have simply held that each co-obligor would contribute a proportionate share of the debt, based on the number of obligors.  See, e.g., Estate of Atkins v. Commissioner, 2 T.C. 332, 346-347 (1943) (decedent was one of three debtors; held, because of contribution rights, estate's deduction limited to one-third of original amount of debt, less amounts decedent had previously paid); McCue v. Commissioner, a Memorandum Opinion of this Court dated Mar. 4, 1946 (decedent was one of 15 parties liable for a tax claim; held, because taxpayer had not proved value of contribution rights, estate's deduction limited to one-fifteenth of amount of claim).

In this case, we cannot determine the value of decedent's contribution rights on the basis of the number of obligors, because much of decedent's share of the Land Bank loan has been assumed by the children and their spouses.

As noted above, by the time of her death decedent had given away all but 4.68 percent of the land constituting the family farm.  The deeds by which decedent made these gifts expressly

provided that the grantees assumed the Land Bank debt to which the transferred land was subject.

As a result of these assumptions by the children (and their spouses), decedent effectively became a guarantor, rather than a co-obligor, with respect to most of the Land Bank loan. Because a guarantor's rights to contribution (or subrogation) are greater than a co-obligor's, it would be inappropriate to determine the value of decedent's contribution rights by reference to the number of obligors on the Land Bank loan. See Estate of Theis v. Commissioner, 770 F.2d 981 (11th Cir. 1985) (section 2053 deduction denied in its entirety where decedent was only secondarily liable, because decedent had 100-percent right of contribution from primary debtor), affg. 81 T.C. 741 (1983).

3. Decedent's Status as Guarantor or "Accommodation" Party

In addition to the assumptions of debt by decedent's transferees, there is other evidence that suggests decedent functioned largely as a guarantor or "accommodation" party with respect to the Land Bank loan.

First, even petitioner claims that only 17.5 percent of the proceeds from the Land Bank loan was used for decedent's benefit. In addition, all of the net loan proceeds not used to pay the taxes and expenses of Garry's estate were deposited in the Vera Lou Klippel agent account, which was owned solely by the children. Moreover, other than the unsubstantiated testimony of

Donald Hendrickson, there is no evidence that more than a de minimis portion of the proceeds was in fact used for decedent's benefit.

Second, no claim was filed against decedent's estate with respect to the Land Bank loan by either the Land Bank or any of decedent's co-obligors.

Third, payments have continued to be made on the Land Bank loan since decedent's death.  In fact, as of March 1, 1998, the balance of the Land Bank loan had been reduced to $636,814 from the $825,068 balance at decedent's death.  Petitioner has not claimed that it made or contributed to any of these payments.

Fourth, neither decedent nor Garry's estate deducted any of the interest payments on the Land Bank loan.  This suggests that the parties to the loan did not regard decedent as a real obligor of the loan.

C.  Conclusion Re Unpaid Mortgage Deduction

In Estate of Theis v. Commissioner, supra, we were required to consider the availability of a deduction for joint and several debt, where the security for the loan was included in the decedent's estate.  We held that no unpaid mortgage deduction was allowable, because the decedent was in fact a guarantor or accommodation party, rather than a true co-obligor.  See id. at 748-751.

As noted above, in this case: (1) The children and their spouses expressly assumed most of decedent's share of the Land Bank loan; (2) decedent had rights of contribution (or subrogation) against her co-obligors on the Land Bank loan, but we are unable to determine the value of those rights; (3) petitioner admits that most of the proceeds of the Land Bank loan did not benefit decedent, and there is little evidence that more than a de minimis portion of the proceeds benefited decedent; (4) payments have continued to be made on the Land Bank loan since decedent's death; (5) neither Garry's estate nor decedent deducted the interest on the Land Bank loan; (6) no claims were filed against decedent's estate with respect to the Land Bank loan; and (7) only a small portion of the security for the Land Bank loan was included in decedent's estate.

On the basis of all these facts and circumstances, we hold that petitioner is not entitled to any deduction for the Land Bank loan under section 2053(a)(4), even though a small portion of the security for the loan was included in decedent's estate. See Estate of Theis v. Commissioner, supra; Estate of Courtney v. Commissioner, supra; cf. Estate of Fawcett v. Commissioner, 64 T.C. 889 (1975) (Commissioner's determination that one-half of joint and several debt was deductible as an unpaid mortgage was not disturbed); Estate of Scofield v. Commissioner, T.C. Memo. 1980-470 (estate's unpaid mortgage deduction, reduced by value of

decedent's right of subrogation, held proper where decedent guaranteed secured debt; property securing debt was distributed to decedent's son (the primary debtor) by the estate, subject to the mortgage; and the giving of the guaranty was not a gift).

III.   Unused Exclusions Available as Conceded in Respondent's Brief; Offset and Deduction for Gift Taxes Payable

Respondent admits that decedent's gifts of farm land during 1979-93 did not consume all of decedent's annual gift tax exclusions for gifts to the children.  Accordingly, on brief respondent has conceded that in determining the taxable gifts made by decedent, the amounts of unused exclusion shown in the table in our findings of fact, see supra pp. 10-11, should be taken into account.

By contrast, petitioner contends that the exclusions available should be twice the amounts shown in the table. Petitioner apparently believes that if any additional gifts were made by decedent, they were made to six donees (presumably, to the children and their spouses) rather than to three.

Petitioner has offered no evidence that decedent intended to give anything other than the family farm land to the children's spouses.  Moreover, the assertion that the investment income at issue herein was transferred to anyone other than the children is totally inconsistent with petitioner's primary argument, which is that all amounts at issue were consumed by a bona fide business

venture owned entirely by decedent and the children.  It is also inconsistent with the evidence introduced to support that argument.

For these reasons we find that the amounts of unused annual exclusion available are those shown in our findings of fact.

The amount of decedent's taxable gifts redetermined in this opinion will increase the amount of estate tax due from petitioner, because it will increase the amount of petitioner's "tentative" estate tax computed under section 2001(b)(1).  However, the amount of gift tax that would have been payable on those gifts, whether or not actually paid, will offset part of this increase in tax, because it will increase the "hypothetical" gift taxes payable for purposes of section 2001(b)(2).  See Estate of Smith v. Commissioner, 94 T.C. 872 (1990).  Of course, if petitioner ultimately pays any gift taxes associated with the gifts at issue herein, petitioner will be entitled to additional deductions from the gross estate on account of those taxes.  See sec. 2053; sec. 20.2053-6(d), Estate Tax Regs.

To reflect all the foregoing,

Decision will be entered

under Rule 155.